No. 39,377

LEE ROSTOCIL and BESSIE ROSTOCIL, *Appellants*, v. THE UNITED OIL AND GAS ROYALTY ASSOCIATION, a Corporation, et al., *Appellees.*

(274 P. 2d 761)

October 9, 1954.

*D. A. Hindman,* of Stockton, argued the cause, and *Stanley Krysl,* of Stockton, was with him on the briefs for the appellants.

*C. R. Sowers,* of Wichita, argued the cause, and *W. McCaslin,* of Stockton, was with him on the briefs for appellee, The United Oil & Gas Royalty Association, et al. *Tinkham Veale,* of Topeka, argued the cause, and was on the briefs for appellees Arthur Lyke, Glen F. Benson and Olga Benson, his wife, and Tinkham Veale and Daisy N. Veale, his wife.

The opinion of the court was delivered by

HARVEY, C. J.; On June 10, 1952, plaintiffs filed their petition in the district court of Rooks county against The United Oil and Gas Royalty Association, hereinafter called the · Association, and its officers to set aside a certain mineral conveyance they made to de-

fendant under date of May 23, 1930, and to quiet their title to the real property described therein. On October 28, 1952, they filed an amended petition in which they included as defendants, Arthur Lyke, Glen F. Benson and Olga Benson, his wife, and Tinkham Veale and Daisy N. Veale, his wife, now owners by mesne conveyances from the Association of a part of the property originally conveyed to it by plaintiffs. Each group of defendants filed a demurrer to the amended petition which was sustained and plaintiffs have appealed. The pertinent facts alleged in the amended petition may be summarized as follows:

On January 10, 1930, E. Reser, of Council Grove, and N. E. Reser, C. R. Sowers, L. G. Jasper, and E. R. Johnson, all of Wichita, filed an application with the Secretary of State for the organization of a corporation under the name of "The United Oil and Gas Royalty Association" stating that it was organized for profit and the purpose for which it was formed was, "The doing of a general oil, gas and mining business and the doing of all things necessary and incidental thereto." Its place of transacting business was Wichita, and the term for which the corporation was to exist was fixed at fifty years; its capital stock was to be divided into ten million shares of no par value to be sold at 1 cent per share and the amount of capital with which the corporation began business was $1,000. This application was passed upon, all fees relating to the issuance thereof were paid, and a charter was issued January 13, 1930. Upon its application to the State Charter Board, an issuer's license certificate was granted it which recited that the Association had filed in the office of the State Bank Commissioner detailed information in regard to its corporate and financial affairs for inspection and information as provided by law; that the State Charter Board by virtue of the powers and duty vested in it by law, had examined said information and finding no evidence of fraud in said information authorized the issuance of this certificate. The Bank Commissioner certified that The United Oil and Gas Royalty Association was authorized and empowered to proceed with the sale and disposal of ten million shares of stock of no par value in this state provided, always, that the sale and disposal should be only in the manner and upon the conditions as follows:

"To be sold for purpose of pooling oil and gas royalties. The stock simply to be used to determine each individual share in the pool. The leases covered by this pooling agreement are to run for a period of not to exceed 21 years and

this company is to finance the pooling of royalties and to receive for their compensation 20% of the net profits from the sale of said royalties, or from the production from said royalties, and then only from the income of the companies royalties or from the net profits may they be reimbursed the expenses in the amount of not to exceed $1.00 per land acre. No royalties of this company may be sold by it prior to within one year of the expiration of said royalty."

It contained a provision to the effect that the State of Kansas, the Charter Board, Bank Commissioner, or other department of State had not approved or recommended the merits or legality of the securities to be sold or offered for sale.

Under date of May 23, 1930, plaintiffs executed, acknowledged and gave the Association the following instrument:

"SALE OF OIL AND GAS ROYALTY

"Know All Men by These Presents:

"That Lee Rostocil & Bessie Rostocil (his wife) of Zurich, Kansas for and in consideration of the sum of One Dollar ($1.00) and Four Thousand Eight Hundred Shares of stock in THE UNITED OIL AND GAS ROYALTY AS-SOCIATION, receipt of which is hereby acknowledged, have granted bargained sold, conveyed and set over, and do by these presents grant, bargain, sell, convey, and set over unto said THE UNITED OIL AND GAS ROYALTY ASSOCIATION A KANSAS CORPORATION, its successors and assigns, all of the following property, estate, right, title and interest therein to-wit:

"Andundivied (sic) one half interest in all of the oil, gas, coal, and other minerals now, or at any time hereafter, laying in or under the following described tract of land (or any part thereof:)

"The South Half ½ of Section 3 and the North west Quarter of Section 10 all in Township 9 South, Range 19 West containing 480 acres more or less.

situated in the County of Rooks State of Kansas; and also an undivided one half interest in all my right, title, interest and estate under and by virtue of any oil and gas mining lease or other mineral lease now, or hereafter, existing upon said premises, or any part thereof, including all rents and royalties accrued and to accrue and also the perpetual and irrevocable right, privilege and easement of entering upon said lands and searching for, drilling wells, sinking shafts, mining, digging, extracting taking and carrying away all of the oil, gas, coal and other minerals in or under said lands, or that may be found therein or thereunder; and also the right to possession and use of so much of said premises at all times as may be necessary to the practical carrying out of the purposes and provisions of this grant provided however that grantor, upon payment to granteemof (sic) one half of all expenses and cost of producing such minerals, shall thereupon be entitled to one half of the net profits arising from the sale and disposition thereof.

"TO HAVE AND TO HOLD, All the aforegranted estate, property and assessments, together with all and singular the right, privileges and hereditaments thereunder belonging or appertaining, unto the said THE UNITED

OIL AND GAS ROYALTY ASSOCIATION, it's (sic) successors and assigns, in fee simple for twenty-one (21) years, and as long thereafter as oil and gas is produced.

"And the said Lee Rostocil & Bessie Rostocil, for Themselves their heirs, successors and personal representatives, do hereby covenant and agree to and with said THE UNITED OIL AND GAS ROYALTY ASSOCIATION, its successors and assigns, that at the delivery of these presents they are lawfully seized in their own right of andabsolute (sic) and indefeasible estate of inheritance in fee simple of, in and to all and singular in aforesaid premises, and property! (sic) that they have good right to sell and convey the same, and warrants the same to be clear, discharged and unencumbered of and from all former grants, titles, charges, judgments, taxes, assessments and encumbrances of whatsoever kind and nature, except an oil and gas leasehold estate, hereinafter referred to, which is recorded in the office of _____ County.

"It is hereby expressly declared that whereas the land, particularly described in this conveyance is understood to be subject to an oil and gas mining lease in favor it is intended that said outstanding lease is fully embraced in the general terms of this conveyance, so as to pass to, and vest in said THE UNITED OIL AND GAS ROYALTY ASSOCIATION, a one half interest not only in the oil and gas Royalty Association had been at the date of the making of said lease, the owner in fee of a one half interest in and to the lands described, and himself one of the lessors therein.

"And it is hereby further expressly declared that it is the true intent and purpose of this conveyance to pass to and vest in the said THE UNITED OIL AND GAS ROYALTY ASSOCIATION, an undivided one half interest in all the mineral and mineral rights in the land first described herein, or that at any time may be found therein or thereunder, and all grantor's rights to operate for said minerals, and deal and contract with regard thereto, including the leasing thereof, as fully to all intent and purpose as if the said THE UNITED OIL AND GAS ROYALTY ASSOCIATION was the absolute owner of the entire title and estate in said lands, with right in the grantor to repay one half of all expenses and receive one half of the net profits.

"IN WITNESS WHEREOF, We have set our hands this 23rd day of May, 1930."

This instrument was duly filed of record in the office of the register of deeds of Rooks county August 18, 1930.

The amended petition further alleged that plaintiffs received no consideration for the conveyance except the sum of $1.00 and a certificate for 4800 shares of no par value of the stock of the Association; that later the charter of the Association was amended to fix the value of the stock as 1 cent per share instead of no par value; that on March 26, 1946, plaintiff Lee Rostocil was delivered a certificate covering 4800 shares of stock in the Association of the par value of 1 cent and the certificate representing the 4800 shares of no par value stock, formerly delivered to him, was cancelled; that

in 1944 a well was drilled upon the land above described which resulted in an oil well which has been producing oil in commercial quantities ever since; that about two years prior to the filing of the action another producing oil well was drilled and thereafter additional wells were drilled so that at the time of the filing of the action there were 14 producing oil wells upon the property; that royalties amounting to more than $30,000.00 have been paid to the Association by oil companies holding ordinary commercial leases which provide for the payment of the usual ⅛ royalty to the owners of the mineral rights, and "That to the best of plaintiffs knowledge and belief" the sum of $9.60 on three occasions, or a total of $28.80, is all that has been paid plaintiffs by said corporation since the execution of said purported mineral conveyance purporting to be dividends on the purported stock held by them. That since the filing of the action a check drawn by the Association payable to plaintiff Lee Rostocil for the sum of $48.00 dated June 7, 1952, was delivered to plaintiffs which check was surrendered to the clerk of the court with a written refusal or declination of plaintiff and authorizing the court to make such disposition of the check as the court finds to be just and proper; that plaintiffs also offered to pay the Association the $1.00 and the $28.80, previously received, and tendered the certificate for the 4800 shares of stock last delivered to them. It was further alleged that the Association is not now engaged in any general oil, gas and mining business and never has except in the pooling of oil and gas royalties in the manner previously explained. It was further alleged that the Association had no authority to hold title for oil, gas and mineral rights for the purpose of conducting a pooling of oil and gas royalties and that no gas is now being produced on the premises. It was further alleged that the total mineral conveyance of plaintiffs to the Association was void for the following reasons:

"(a) Said conveyance and the transaction pertaining thereto as between plaintiffs and said corporation is ultra vires, and no title ever passed to said corporation, or from plaintiffs.

"(b) Said purported conveyance and the transaction pertaining thereto insofar as the rights of plaintiffs are concerned is unconscionable.

"(c) The term of said conveyance has expired.

"(d) The purported consideration for said conveyance has failed."

It was further alleged that on October 10, 1948, the Association executed and delivered to P. M. Hedrick a conveyance purported to convey to him 80/320ths of the oil, gas and mineral rights to

two described quarter sections of land described in the conveyance of plaintiffs to the Association; that on July 1, 1949, Hedrick executed three conveyances purporting to convey to Arthur Lyke 30/320ths, to Glen F. and Olga Benson 20/320ths, and to Tinkham Veale 30/320ths of the mineral rights he had received from the Association, all of which conveyances were duly recorded. That at the time the above grantees received such conveyances each of them had actual or constructive knowledge of the defects in the title and ownership of the interest purported to be conveyed by the respective conveyances, which defects were previously alleged, and that none of the grantees were innocent or bona fide purchasers. It was further alleged that plaintiffs were informed and believed that the respective grantees paid reasonable sums for the purported conveyances; that each of them had received proceeds from the oil produced and that plaintiffs consent that they retain the money to the extent of the amount they paid for the purported conveyances. This consent is made without prejudice to plaintiffs but as a matter of equity and fair play. It was further alleged that the interest or claim of each of the defendants is null and void and without foundation in law or equity and exist as clouds upon the title of the plaintiffs. The prayer was that all the purported conveyances be set aside and the title of the real property be quieted in plaintiffs.

The Association and its officers and the defendants Lyke, the Bensons and Veale filed separate demurrers to the petition 'for the reason that it failed to allege facts sufficient to state a cause of action against them. These demurrers were considered by the court and sustained. Plaintiffs have appealed.

In this court appellants first contend the "Mineral deed is terminated by reason of limitations contained in Blue Sky Board permit." It is argued that since the Blue Sky Board had authority to issue a permit it had authority to include therein any limitations it thought proper. The point is not well taken. Ch. 140, Laws 1929, being our first act relating to speculative securities, was in force at the time the permit was issued to the Association and at the time of the execution of the mineral conveyance by plaintiffs to the Association. Sec. 6 of that act provides that the applicant for the permit should file with the State Bank Commissioner full information pertaining to the securities it desired authority to sell, showing in detail the plan on which the business is to be conducted, the capital stock, names of the interested parties, etc. In § 7 of that

act it is made the duty of the Bank Commissioner to examine the application and accompanying papers and make a full report to the Charter Board which should examine the report of the Bank Commissioner and give the applicant a hearing if he so desires and make an independent investigation if they desire, and grant or refuse the permit. Subsection (2), § 7, stated if certain findings were made by the board it should deny the application, and subsection (3) of the section reads:

"If the charter board shall find that none of the conditions last above named exist, it shall direct the bank commissioner to issue a permit authorizing the sale of such securities, . . ."

It seems clear from this statute that the authority of the Charter Board is limited to do one of two things: To deny the application for the permit or to direct the Bank Commissioner to issue it. Counsel for appellants frankly state that although they had made diligent search they find no authority to support their position on this question. We think the statute is clear.

The permit itself is peculiarly worded. It is difficult to interpret and apply it to the facts of this case. We think it unnecessary to endeavor to do so. The fact remains that the Association did have a permit to sell its securities. We note specifically that the permit does not undertake to state the character of the title to land or mineral rights which the Association could purchase. The statute gave it no authority to do so and the Charter Board did not attempt to invade that field. So far as the permit is concerned the Association had authority to buy any type of mineral rights it desired to purchase. We note also that this record does not disclose that the plaintiffs or the defendants Arthur Lyke, Glen F. and Olga Benson, and Tinkham Veale ever saw this permit. It is not an instrument that is filed in the office of the register of deeds or shown on the abstract of title. The purchasers of fractional mineral interests from the Association were not bound by the terms of the license issued by the Blue Sky board. See, *Moos v. Landowners Oil Ass'n,* 136 Kan. 424, 15 P. 2d 1073. The Association was bound to get the license in order to avoid the penalties of Ch. 140, Laws 1929, and particularly § 23 of the chapter. In the petition it was alleged that the purchasers of the fractional interests, Lyke, the Bensons and Veale had actual or constructive knowledge of the terms of the license. This is tantamount to an allegation that they had constructive notice. That is made clear by appellants' brief, the contention

being that when these defendants purchased such fractional interests it was their duty to examine the terms of the license issued by the Blue Sky board. They had no such duty.

Counsel for appellants next contend the "Purported mineral conveyance has terminated because of the express limitations therein." They point out that it was executed on May 23, 1930, and contained the limitation "in fee simple for twenty-one (21) years and as long thereafter as oil and gas is produced." The amended petition in this action to set it aside was filed on June 19, 1952. It was alleged in the petition that no gas was ever produced on the land. It is contended that to extend the instrument after its initial period of 21 years both oil and gas had to be in production on the land at the end of the 21-year period.

We think the contention cannot be sustained. Other language in the instrument must be taken into account. The instrument conveyed to the Association:

"An undivided one half interest in all of the oil, gas, coal, and other minerals now, or at any time hereafter, laying in or under the following described tract of land (or any part thereof:) (describing it) . . . and also the perpetual and irrevocable right, privilege and easement of entering upon said lands and searching for, drilling wells, sinking shafts, mining, digging, extracting taking and carrying away all of the oil, gas, coal and other minerals in or under said lands, or that may be found therein or thereunder; . . . And it is hereby further expressly declared that it is the true intent and purpose of this conveyance to pass to and vest in the said THE UNITED OIL AND GAS ROYALTY ASSOCIATION, an undivided one half interest in all the mineral and mineral rights in the land first described herein, or that at any time may be found therein or thereunder, and all grantor's rights to operate for said minerals, and deal and contract with regard thereto, including the leasing thereof, as fully to all intent and purpose as if the said THE UNITED OIL AND GAS ROYALTY ASSOCIATION was the absolute owner of the entire title and estate in said lands, with right in the grantor to repay one half of all expenses and receive one half of the net profits."

The phrase relied upon by appellants is ambiguous. It reads: "in fee simple for twenty-one (21) years and as long thereafter as oil and gas *is* produced." (Emphasis ours.) The verb "is" refers to a singular number. If intended to apply to two or more things the verb "are" should have been used.

In *Noble v. Teeple,* 58 Kan. 398, 401, 49 Pac. 598, construing a will, the court had occasion to say:

". . . Whenever necessary in order to ascertain the intent with which words are used, and to give them effect when their meaning is ascertained, the disjunctive 'or' will be read conjunctively, and *vice versa.* . . ."

In *Starr v. Flynn*, 62 Kan 845, 848, 62 Pac. 659, construing a statute, the court said:

"It is permissible to substitute 'or' for 'and,' and *vice versa*, to render legislative acts intelligible and effective. . . ."

In *Kennedy v. Haskell*, 67 Kan. 612, 616, 73 Pac. 913, construing a statute, the court used this language:

". . . It is a principal well settled that in the construction of statutes, as well as wills and contracts, where the sense demands it, or the intention is evident, the words 'or' and 'and' may be exchanged and used convertibly. . . ."

See, also, *Vietti v. Fuel Co.* 109 Kan. 179, 197 Pac. 881; Sutherland on Statutory Construction, § 252; 17 C. J. S., Contracts, p. 722; also 82 C. J. S., Statutes, § 335, and G. S. 1949, 77-201, *Third*.

We think the word "and" in the clause relied upon by appellants should be construed in harmony with the intention of the parties as shown by the instrument as a whole and should apply to oil, gas, coal or other minerals which were being produced upon the land.

Counsel for appellants next argue that the taking of the mineral conveyance is *ultra vires*. Plaintiffs have no authority to raise that question. Whether a corporation is exceeding its powers may be inquired into only by the state on the relation of the attorney general or the county attorney. See, *Harris v. Gas Co.*, 76 Kan. 750, 92 Pac. 1123, and *Home Owners' Loan Corp. v. Humphrey*, 148 Kan. 779, 783, 85 P. 2d 7. Passing that, the charter of the Association contains the following:

"That this corporation is organized for profit, and that the purposes for which it is formed are:

"The doing of a general oil, gas and mining business and the doing of all things necessary and incidental thereto."

We are not prepared to say as a matter of law that the pooling of oil and gas royalties is foreign to the purposes for which the Association was organized. In the State Charter Board's issuer's license certificate the Association was, ". . . authorized and empowered to proceed with the sale and disposal of ten million shares of stock of no par value . . . To be sold for the purpose of pooling oil and gas royalties. . . ." The contention made under this point has no substantial merit.

It is next argued that the transaction is void as being unconscionable, or the facts are such as to place the burden on defendants of

showing otherwise. Repeatedly, this court has held that transactions of this character are not unconscionable. See, *Moos v. Landowners Oil Ass'n,* 136 Kan. 424, 15 P. 2d 1073; *Beltz v. Griggs,* 137 Kan. 429, 20 P. 2d 510, and *Eichman v. Landowners Oil Ass'n,* 153 Kan. 791, 113 P. 2d 1056. We see nothing in the facts stated in the petition to take it out of that rule.

It is next argued that the purported conveyance is void for the failure of consideration. The record clearly discloses plaintiffs got the consideration recited in the conveyance and there is nothing in the record to indicate failure of consideration. The contract itself imports a consideration (G. S. 1949, 16-107).

Lastly, it is argued why the statute of limitations, laches or estoppel does not apply. On this point it is argued that if the purported mineral conveyance in question has terminated by reason of either or both of appellants' first two contentions, that is to say, by reason of the limitations contained in the Blue Sky permit or because of the wording of the instrument, the action was brought in time, and that if any or all three of appellants' last contentions are good, that is to say, *ultra vires* acts, unconscionable transaction, or failure of consideration, the statute of limitations does not apply because the instrument is rendered absolutely void and a void instrument may be set aside at any time. Since we have determined that both the first two and the last three contentions of appellants have no substantial merit the contention that the statute of limitations is not applicable also lacks merit.

Counsel for appellees in their briefs, in addition to answering contentions of the appellants, stress the pertinent statute of limitations. They contend that if the points argued by appellants ever had any substantial merit the action should have been brought within two years after they executed the mineral deed to the Association, which was May 23, 1930. The action was not brought until June 10, 1952, more than 22 years after the deed was executed. The point is well taken. The speculative securities act, ch. 140, Laws of 1929, in force at the time the mineral conveyance was executed contained its own statute of limitations. Section 18 of the act reads in part:

"Every sale or contract for sale [of speculative securities] made in violation of any of the provisions of this act shall be voidable at the election of the purchaser . . . : *Provided,* That no action shall be brought for the recovery of the purchase price after two years from the date of such sale or contract for sale: . . ."

That two years expired May 23, 1932. Chapter 140, § 18, Laws of 1929, was amended by ch. 129, § 13, Laws of 1935, so it would make the time for bringing the action three years instead of two years, and this act was amended by ch. 177, § 1, Laws of 1937, now G. S. 1949, 17-1240, extending the time for the purchaser of speculative securities to 15 years under certain conditions mentioned in the act, none of which appear to be applicable to the facts of this action; but, if any of them do apply the 15 years expired on May 23, 1945, more than seven years before this action was brought. It is clear the action was filed too late under any interpretation that could be given to the statutes above mentioned. The statute really applicable here, however, is the one of two years fixed by ch. 140, § 18, Laws of 1929. After that two years had elapsed without an action being brought to set aside the sale the fact that later statutes were enacted in 1935 and 1937 fixing a longer time did not renew a right which had been lost by failure to act within the two years provided by the 1929 act. See, *Terrill v. Hoyt*, 149 Kan. 51, 87 P. 2d 238.

This accords with the rule stated by the annotator in 36 A. L. R. 1317, and again in 133 A. L. R. 386, as follows:

"So far as concerns the title to real or personal property the fall of the bar of the Statute of Limitations creates a vested right which cannot be impaired by the legislature."

Many federal and state decisions are cited in support of the rule.

This opinion might have been written upon the application of the statute of limitations without treating the several questions raised by counsel for the appellants. We treated those questions because of the insistence of appellants' counsel that the questions they raised, or at least part of them, were new and not covered by any of our former decisions.

We have examined all of the authorities cited by counsel but see no occasion to analyze them in detail here. Most of them may be found listed in our statute under G. S. 1949, 17-1240.

We find no error in the record. The judgment of the trial court is affirmed.